UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. |
| | : | |
| DOUGLAS ZEMSKY, | : | VIOLATION: |
| | : | 18 U.S.C. § 1349 |
| Defendant. | : | (Conspiracy to Commit Mail and |
| | : | Wire Fraud) |
| | : | |

## INFORMATION

The United States Attorney charges that:

## COUNT I

At all times material to this information:

## BACKGROUND

1.      DOUGLAS ZEMSKY was a resident of Hallendale, Florida, who, along with an individual hereinafter referred to as MB, controlled and operated DC Capital Group, Inc., a Florida limited liability corporation.

2.      PH was a resident of Boca Raton, Florida, and was a private investor who owned and controlled a Florida limited liability corporation operating as a hedge fund "Corporation S".

3.      AF was a resident of Lighthouse Point, Florida, who was licensed by the National Association of Securities Dealers ("NASD") as a registered securities representative and securities principal, and who controlled and operated a securities brokerage firm. As a registered securities representative and securities principal, AF had a relationship of trust and confidence with his customers, and owed duties of loyalty, fair dealing and honesty to his customers.

4.      RS was a resident of Houston, Texas and was an attorney licensed by the State of

Texas. During the relevant period, RS engaged in a business in which he used his position as an attorney (i) with the help of others, to obtain ownership and control of publicly traded shell companies without notifying or obtaining the consent of the officers, directors, and shareholders of those shell companies ("shareholders, officers, and directors of record"), and (ii) to deliver purported ownership and control of those companies to his customers, who paid him compensation well in excess of $100,000 per shell company transferred. RS typically employed the following procedure, which will be sometimes referred to as the RS Procedure, fraudulently to obtain control and ownership of publicly traded shell companies and purportedly to deliver that control and ownership to others in return for compensation. RS usually began the RS Procedure by identifying a company that was delinquent in paying fees and taxes to the Secretary of State for the State of its incorporation, and a company that also had previously had its stock traded in a securities market but whose stock had not been recently actively traded. Thereafter, RS would cause the submission to the relevant Secretary of State's Office of the payment of delinquent fees and taxes, and also a notification to the Secretary of State that the chosen company was now controlled by a new officer, who was in fact a person working with RS. Such submissions would be made without the knowledge and consent of the shareholders, officers and directors of record. In addition, RS would not disclose to the relevant Secretary of State's Office that delinquent fees and taxes were being paid and a new officer and director named without the consent or knowledge of the corporation's shareholders, officers, and directors of record. Similarly, RS would make no effort to notify the company's officers, directors or shareholders of record that he was unilaterally and without their permission causing a new officer to be named for the corporation with the relevant Secretary of State's Office.

Thereafter, RS, without the knowledge and consent of the shareholders, officers, and directors of record, would cause documents, such as an amended certificate of incorporation signed by a new corporate officer, to be filed with the Secretary of State's Office purporting to authorize a change in the company's name and approval for a reverse stock split. After the reverse stock split, RS would then, without the knowledge and consent of the shareholders of record or the prior officers and directors of the company, cause a stock transfer agent company to issue large numbers of shares of stock to persons or their nominees who paid RS significant compensation. The reverse stock split and issuance of new shares had the effect of first reducing and then diluting the stock holdings of the prior shareholders of record to a nominal amount. RS would assure that the purchaser(s) of the shell company or their nominees received free trading stock without registering the stock with the SEC prior to it being publicly offered for sale. RS accomplished this goal by causing an attorney's opinion letter to be sent to the transfer agent falsely claiming that the new shares were exempt from the registration requirements of the Securities Act of 1933. The receipt of the false attorney opinion letter caused the transfer agent to issue unrestricted shares. RS typically charged purchasers of the shell company $125,000 to $175,000 to engage in the RS Procedure.

5. The Pink Sheets refers to an electronic inter-dealer price quotation system that displays quotation and last-sale information for many securities traded in the Over the Counter securities market.

6. American Financial Holdings, Inc., ("AFHJ") was a Delaware corporation which had de minimus assets and revenues and virtually no business operations. Prior to its name change in or about 2004, AFHJ was known as California Cyber Design, Inc. ("CCDI"), and

CCDI's common stock was quoted under the trading symbol "CCDI" on the Pink Sheets. In 2004, RS utilized the RS Procedure generally described in paragraph 4 to cause a change in the ownership, control and the name of CCDI without the knowledge and consent of the shareholders, officers and directors of record of CCDI. RS caused CCDI to become AFHJ through filings he caused to be made with the Delaware Secretary of State using the procedure generally described in paragraph 4 above. As of September 2004, PH (through nominees) and AF owned and controlled virtually all of the outstanding shares of stock in AFHJ. During the period of at least September 23, 2004, through August 12, 2005, AFHJ's common stock was quoted under the trading symbol "AFHJ" on the Pink Sheets.

7. Secure Solutions Holdings, Inc. ("SSLX") was a Nevada corporation that at certain times material herein was headquartered in the District of Columbia, had de minimus assets and revenues, and virtually no business operations. Prior to its name change in or about April 2005, SSLX was known as JRW & Associates ("JRWA"), and JRWA's common stock was quoted on the Pink Sheets under the trading symbol JRWA. In or about April 2005, RS utilized the RS Procedure generally described in paragraph 4 to cause a change in the ownership, control and the name of JRWA without the knowledge and consent of the shareholders, officers and directors of record of JRWA. RS caused JRWA to become SSLX through filings he caused to be made with the Nevada Secretary of State using the procedure generally described in paragraph 4 above. In the Spring of 2005, DOUGLAS ZEMSKY, with RS's assistance gained control of SSLX. ZEMSKY and RS caused a large number of the outstanding free-trading shares of SSLX common stock to be issued to secret nominees of PH, secret nominees of ZEMSKY and to RS (75,000 shares). In addition, ZEMSKY executed an SSLX board of

director's resolution ordering the issuance of 40 million restricted SSLX shares in his own name. During the period of at least April 22, 2005, through July 14, 2005, SSLX's common stock was listed under the trading symbol "SSLX" on the Pink Sheets and publicly traded on the Over the Counter securities market. The price of SSLX shares reached a high of more than $9 per share during the time period that ZEMSKY, PH, and AF executed their scheme to defraud SSLX investors and AF's customers. On July 15, 2005, the Securities and Exchange Commission suspended the trading of SSLX securities for 10 days.

## The Conspiracy

8. From in or about March of 2005, and continuing thereafter through at least September 27, 2005, in the District of Columbia and elsewhere, the defendant DOUGLAS ZEMSKY, PH, and AF together with others, did unlawfully, knowingly, and intentionally conspire to commit:

(A) Mail Fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice, among other things, to: (a) deprive AF's customers of the intangible right to their securities broker AF's honest services; (b) deprive a principal of the intangible right to an agent's honest services; (c) violate AF's duty as a securities broker to provide best execution of securities transactions placed for his customers; (d) violate AF's duty as a securities broker to recommend only suitable securities transactions for his customers; (e) violate AF's duty as a broker and an agent to disclose to his customer and principal all material information

5

concerning the affairs that had been entrusted by the customer and principal to the broker and agent; (f) violate AF's duty as an agent to disclose to his principal (customer) all material facts concerning any self interest or conflict of interest the agent may have concerning securities transactions in the principal's account; and (g) to obtain investors' and AF's customers' money and property, and in the execution of such scheme, to knowingly cause to be delivered by the United States Postal Service and by private and commercial interstate carrier matters and things in violation of Title 18, United States Code, Sections 1341 and 1346.

(B)  Wire Fraud, that is, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, to wit, a scheme and artifice, among other things, to: (a) deprive AF's customers of the intangible right to their securities broker AF's honest services; (b) deprive a principal of the intangible right to an agent's honest services; (c) violate AF's duty as a securities broker to provide best execution of securities transactions placed for his customers; (d) violate AF's duty as a securities broker to recommend only suitable securities transactions for his customers; (e) violate AF's duty as a broker and an agent to disclose to his customer and principal all material information concerning the affairs that had been entrusted by the customer and principal to the broker and agent; (f) violate AF's duty as an agent to disclose to his principal (customer) all material facts concerning any self interest or conflict of interest the agent may have concerning securities transactions in the principal's account; and

(g) to obtain investors' and AF's customers' money and property, did unlawfully, wilfully, and knowingly transmit and cause to be transmitted by means of wire communications in interstate commerce, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346.

## Purpose of the Conspiracy

9. A purpose of the conspiracy was for defendant DOUGLAS ZEMSKY and co-conspirators, to fraudulently obtain money, funds and property from customers of AF and other investors for the use and benefit of the defendant and co-conspirators, to deprive customers of AF of the intangible right to the honest services of their broker, and to further the conspiracy by various means, including by omissions of material fact and false material pretenses, representations and promises, and by artificially manipulating the price of the securities of SSLX.

## Manner and Means of the Conspiracy

10. It was part of the conspiracy that DOUGLAS ZEMSKY, PH, AF, and other co-conspirators agreed to obtain secret control of a large majority of the outstanding free-trading shares of stock in SSLX, and thereafter fraudulently manipulate the market price of SSLX stock by coordinating prearranged "matched orders" (that is, stock purchases and sales with the knowledge and understanding that a reciprocal order of substantially the same amount would be entered at or around that time for substantially the same price) at inflated prices through the Over the Counter securities market to create the false and misleading appearance of an active and rising market in SSLX stock, to induce victims to purchase shares at artificially inflated prices

that were far in excess of the value of the securities, and to have AF customer accounts purchase SSLX stock at artificially inflated prices.

11.    It was further part of the conspiracy that on or about April 22, 2005, through telephone conversations and other messages and coordinated trading activities, DOUGLAS ZEMSKY, PH, AF, RS and others caused pre-arranged trades of SSLX stock to be made at the artificially inflated price of approximately $2 per share, resulting in RS receiving approximately $150,000 in proceeds, which were in large part fraudulently obtained from AF's customers, and resulting in SSLX stock beginning to trade on April 22, 2005, at the artificially inflated and manipulated price of $2 per share.  These transactions had the effect of compensating RS for engaging in the fraudulent RS Procedure to deliver control of SSLX to ZEMSKY, and to deliver control of free trading SSLX shares to nominees of ZEMSKY and PH.

12.    It was further part of the conspiracy that DOUGLAS ZEMSKY, PH, AF, and other co-conspirators agreed that AF and PH would execute prearranged trades of SSLX stock between AF customer accounts and PH nominees through the Over the Counter securities market and split the profits from such trades between AF and PH without informing AF's customers that AF was receiving significant kickbacks from the profits PH received from the sale of SSLX stock to AF's customer accounts at grossly inflated prices.

13.    It was further part of the conspiracy that after AF used matched orders to cause his customer accounts to purchase SSLX stock in the Over the Counter securities market at inflated prices from nominees of PH, AF on multiple occasions met PH in a gas station parking lot and received an envelope of cash from PH which was a secret kickback to AF of a portion of the profits that PH's nominees had received from selling SSLX stock to AF's customers at

inflated prices.

14. It was further part of the conspiracy that in order to disguise the payment of hundreds of thousands of dollars of secret kick-back payments to AF of profits from the sales of SSLX stock to AF's customer accounts at artificially inflated prices, PH and AF arranged "purported" private stock transactions in which PH's wife and another entity controlled by PH paid approximately $820,000 to a company controlled by AF for approximately 170,000 restricted shares of AFHJ stock at a time when PH and AF well knew that the restricted shares of AFHJ stock were not worth anything near $820,000. PH and AF each knew and understood that the $820,000 transferred to AF was a cash kickback of profits that had been received from selling SSLX stock to AF's customers at grossly inflated prices.

15. It was further part of the conspiracy that AF failed to disclose to his customers material information about investing in SSLX, including his personal interest in the SSLX trades.

16. It was further part of the conspiracy that AF executed orders in customer accounts to purchase SSLX stock in the Over the Counter securities market from accounts controlled by PH under the false pretense that the prices paid for SSLX stock were prices determined by a competitive market.

17. It was further part of the conspiracy that AF, well knowing that he was receiving substantial undisclosed kickback payments for the execution of trades in his customers' accounts to purchase SSLX stock, caused confirmation statements with disclosures about commissions to be sent to his customers which falsely represented to his customers the amount of compensation that was being paid to AF and AF's brokerage firm for the purchases of SSLX stock by their

accounts.

19. It was further part of the conspiracy that DOUGLAS ZEMSKY, PH and AF deprived AF's customers of the intangible right to a broker's honest services.

19. It was further part of the conspiracy that DOUGLAS ZEMSKY received through a nominee and retained 1,075,000 free trading shares of SSLX stock, 100,000 restricted shares of SSLX stock, and $70,000 as payment for his participation in the fraudulent manipulation of SSLX's stock price and the scheme to defraud investors and AF's brokerage customers.

20. It was further part of the conspiracy that as a result of the fraudulent pre-arranged trades of SSLX stock, the co-conspirators fraudulently obtained proceeds in excess of $3.7 million.

21.     It was further part of the conspiracy that in order to conceal the conspiracy and scheme to defraud AF's customers, DOUGLAS ZEMSKY did give certain false and misleading answers during sworn testimony before the Securities and Exchange Commission on or about September 28, 2005.

**(Conspiracy, in violation of Title 18, United States Code, Section 1349)**

                                    Respectfully submitted,

                                    JEFFREY A. TAYLOR
                                    United States Attorney
                                    for the District of Columbia

By:                           _____
                                JONATHAN R. BARR
                                D.C. Bar No.: 437334
                                JOHN D. GRIFFITH
                                Iowa Bar No.:  4622
                                Assistant U.S. Attorneys
                                555 4th Street, N.W.
                                Washington, D.C.  20530
                                (202) 514-9620 (Barr)
                                (202) 353-2453 (Griffith)