UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

OCT 1 8 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA :

     v.      : Criminal No.  07-246

DOUGLAS ZEMSKY,    :

     Defendant.  :

## STATEMENT OF THE OFFENSE

  Pursuant to Fed. R. Cr. P. 11, defendant DOUGLAS ZEMSKY agrees and stipulates as follows:

  1. DOUGLAS ZEMSKY was a resident of Hallendale, Florida, who, along with an individual hereinafter referred to as MB, controlled and operated DC Capital Group, Inc., a Florida limited liability corporation.

  2. PH was a resident of Boca Raton, Florida, and was a private investor who owned and controlled a Florida limited liability corporation operating as a hedge fund "Corporation S".

  3. AF was a resident of Lighthouse Point, Florida, who was licensed by the National Association of Securities Dealers ("NASD") as a registered securities representative and securities principal, and who controlled and operated a securities brokerage firm. As a registered securities representative and securities principal, AF had a relationship of trust and confidence with his clients, and owed duties of loyalty, fair dealing and honesty to his clients.

  4. RS was a resident of Houston, Texas and was an attorney licensed by the State of Texas. During the relevant period, RS engaged in a business in which he used his position as an attorney (i) with the help of others to obtain ownership and control of publicly traded shell companies without notifying or obtaining the consent of the officers and shareholders of those

shell companies, and (ii) to deliver purported ownership and control of those companies to

clients, who paid him compensation well in excess of $100,000 per shell corporation transferred.

RS typically employed the following procedure, which will be sometimes referred to as the RS

Procedure, to obtain control and ownership of publicly traded shell companies and purportedly

to deliver that control and ownership to others in return for compensation. RS usually began the

RS Procedure by identifying a company that was delinquent in paying fees and taxes to the

Secretary of State for the State of its incorporation, and a company that also had previously had

its stock traded in a securities market but whose stock had not been actively traded in more than a

year. Thereafter, RS would cause the submission to the relevant Secretary of State's Office of

the payment of delinquent fees and taxes, and also a notification to the Secretary of State that the

chosen company was now controlled by a new officer, who was in fact a person working with

RS. Such submissions would be made without the knowledge and consent of the shareholders,

officers and directors of the company ("shareholders, officers and directors of record"). In

addition, RS would not disclose to the relevant Secretary of State's Office that delinquent fees

and taxes were being paid and a new officer and director named without the consent or

knowledge of the corporation's shareholders, officers, and directors of record. Similarly, RS

would make no effort to notify the company's officers, directors or shareholders of record that he

was unilaterally and without their permission causing a new officer to be named for the

corporation with the relevant Secretary of State's Office. Thereafter, RS, without the knowledge

and consent of the shareholders, officers and directors of record, would cause documents, such as

an amended certificate of incorporation signed by a new corporate officer, to be filed with the

Secretary of State's Offices purporting to authorize a change in the company's name and

2

approval for a reverse stock split. After the reverse stock split, RS would then, without the

knowledge and consent of the shareholders of record or the prior officers and directors of the

company, cause a stock transfer agent company to issue large numbers of shares of stock to

persons or their nominees who paid RS significant compensation. The reverse stock split and

issuance of new shares had the effect of first reducing and then diluting the stock holdings of the

prior shareholders of record to a nominal amount. RS would assure that the purchaser(s) of the

shell company or their nominees received free trading stock with no requirement that the stock be

registered with the SEC prior to it being distributed and publicly traded. RS accomplished this

goal by causing an attorney's opinion letter to be sent to the transfer agent falsely claiming that

the new shares were exempt from the Registration requirements of the Securities Act of 1933.

The receipt of the false attorney opinion letter caused the transfer agent to issue unrestricted

shares. RS typically charged purchasers of the shell company $125,000 to $175,000 to engage in

the RS Procedure.

5. The Pink Sheets refers to an electronic inter-dealer price quotation system that

displays quotation and last-sale information for many securities traded in the Over the Counter

securities market.

6. American Financial Holdings, Inc., ("AFHJ") was a Delaware corporation which had

de minimus assets and revenues and virtually no business operations. Prior to its name change in

or about 2004, AFHJ was known as California Cyber Design, Inc. ("CCDI"), and CCDI's

common stock was quoted under the trading symbol "CCDI" on the Pink Sheets. In 2004, RS

utilized the RS Procedure generally described in paragraph 4 to cause a change in the ownership,

control and the name of CCDI without the knowledge and consent of the shareholders, officers

3

and directors of record of CCDI. RS caused CCDI to become AFHJ through filings he caused to be made with the Delaware Secretary of State using the procedure generally described in paragraph 4 above. As of September of 2004, PH (through nominees) and AF owned and controlled virtually all of the outstanding shares of stock in AFHJ. During the period of at least September 23, 2004, through August 12, 2005, AFHJ's common stock was quoted under the trading symbol "AFHJ" on the Pink Sheets.

7. Secure Solutions Holding, Inc. ("SSLX") was a Nevada corporation that at certain times material herein was headquartered in the District of Columbia, had de minimus assets and revenues, and virtually no business operations. Prior to its name change in or about April 2005, SSLX was known as JRW & Associates ("JRWA"), and JRWA's common stock was quoted on the Pink Sheets under the trading symbol JRWA. In or about April 2005, RS utilized the RS Procedure generally described in paragraph 4 to cause a change in the ownership, control and the name of JRWA without the knowledge and consent of the shareholders, officers and directors of record of JRWA. RS caused JWRA to become SSLX through filings he caused to be made with the Nevada Secretary of State using the procedure generally described in paragraph 4 above. In the Spring of 2005, DOUGLAS ZEMSKY, with RS's assistance gained control of SSLX. ZEMSKY and RS caused a large number of the outstanding free-trading shares of SSLX common stock to be issued to secret nominees of PH, secret nominees of Zemsky and to RS (75,000 shares). In addition, ZEMSKY executed an SSLX board of director's resolution ordering the issuance of 40 million restricted SSLX shares in his own name. During the period of at least April 22, 2005, through July 14, 2005, SSLX's common stock was listed under the trading symbol "SSLX" on the Pink Sheets and publicly traded on the Over the Counter

4

securities market.  On July 15, 2005, the Securities and Exchange Commission suspended the trading of SSLX securities for 10 days.

**The AFHJ Fraud**

8.  In 2004, PH, and registered broker AF decided to obtain a publicly traded shell company.  A "shell" company is a corporation with no or nominal business operations, and with no or nominal assets or assets consisting solely of cash or cash equivalents.  AF and PH wanted PH to secretly gain control of almost all of the free trading shares of a shell company whose common stock could be quoted on the Pink Sheets and publicly traded on the over the counter market without registering the shares of common stock with the Securities and Exchange Commission.  AF and PH wanted to conceal PH's planned control of almost all of the shell company's free trading stock.  In addition, AF and PH wanted to have AF gain control of a majority of the restricted shares of AFHJ stock.[1]  PH contacted Douglas Zemsky to enlist his assistance in obtaining control for AF of a publicly traded shell company, and in secretly obtaining control for PH of almost all of the shell company's free trading stock.  Zemsky and MB agreed to assist PH in these efforts in return for compensation of approximately $25,000.

9.  Douglas Zemsky and his business partner MB contacted RS and requested that RS assist them in gaining effective ownership and control of a publicly traded shell company, and that RS assist them in having the shell company issue 4,000,000 free trading shares and transfer control of those free trading shares to PH's nominees.  Zemsky, RS and MB knew and

---

[1]Shares of stock in a publicly traded company are either restricted or unrestricted ("free trading") securities.  Restricted stock is common stock for which there is a restriction placed on the stock that prevents the owner of the securities from selling the stock while the restriction is in effect.  Unrestricted or free trading shares can be publically offered and sold in the securities markets without restriction.

understood that such activity would result in PH gaining secret control of nearly all of the free trading shares of the shell company.

10.  Douglas Zemsky and MB both understood that RS would deliver ownership and control of the publicly traded shell company.  RS agreed to provide a shell company, which he would obtain and "clean up" utilizing the RS Procedure, in exchange for a $25,000 fully refundable deposit and $150,000 payable at closing.  RS informed Zemsky that he would issue an opinion letter to the shell company's transfer agent instructing the transfer agent to issue 4,000,000 free trading shares without a restrictive legend to the shareholders designated by Zemsky and MB based upon RS's representation in the letter that Securities and Exchange Commission Rule 504 in combination with provisions of the Texas Administrative Code allowed the shares to be issued without a restrictive legend.  RS, Zemsky and MB executed the plan to transfer the free trading shares of AFHJ to designees of Zemsky and MB.  Thereafter, Zemsky and MB caused the free trading shares of AFHJ to be transferred to nominees of PH.

11.  MB and Zemsky eventually paid RS $150,000 plus a refundable fee of $25,000 for RS to utilize the RS Procedure to transfer ownership and control of AFHJ and 4,000,000 free trading shares of AFHJ to designees of MB and Zemsky.  In or about August and September 2004, RS arranged for 40 million restricted shares of AFHJ to be issued to MB and 4 million unrestricted shares of AFHJ to be transferred to designees of MB and Zemsky.  Thereafter, in September 2004, MB cancelled his 40 million restricted shares and arranged for AFHJ to issue 15 million restricted shares to AF, which gave AF control of AFHJ.  Similarly, MB and Zemsky arranged for the 4 million unrestricted free trading shares of AFHJ stock to be transferred to nominees of PH.  In return for AF and PH receiving control of these AFHJ shares, AF caused DC

6

Capital Group to receive approximately $225,000, $150,000 of which was thereafter paid to RS and $25,000 of which was thereafter paid to PH.

12. After Zemsky and MB arranged for the transfer of 15 million restricted shares of AFHJ stock to AF and approximately 4,000,000 free trading shares to nominees of PH, MB discussed the proposed transaction with a licensed securities law attorney "JB," whom Zemsky and MB had retained in the past and whose judgment Zemsky and MB trusted. JB informed MB that the RS' procedure to deliver control of the shell and to have the transfer agent issue free trading shares exempt from registration was not legal and was incorrect. MB informed Zemsky of the advice he received from JB.

13. After Zemsky and MB arranged for the transfer of 15 million restricted shares of AFHJ stock to AF and approximately 4,000,000 free trading shares to nominees of PH, Zemsky learned that AF and PH used the AFHJ shares to defraud the brokerage firm customers of AF in connection with the sale and purchase of AFHJ shares. Zemsky learned that AF had his customers' accounts purchase shares of AFHJ in the open market from nominees of PH. AF and PH closely coordinated the orders for the trades to try to assure that AF's customer account purchases on the open market at grossly inflated prices were matched to sales of AFHJ stock by PH's nominee accounts. AF and PH also agreed that PH would pay AF kickbacks of a portion of the profits from the fraudulent sale of AFHJ stock to AF's customers at grossly inflated prices. Zemsky knew that AF and PH were illegally manipulating the market price for AFHJ stock. AF, PH and Zemsky each knew that AF, by defrauding his customers in order to receive kickbacks, was violating the duties of honesty, fair dealing and loyalty which AF owed to his brokerage firm customers.

**The SSLX Fraud**

14.    By March 2005, Zemsky knew and understood the RS Procedure. In or about March 2005, PH informed Zemsky that he wanted his assistance in obtaining a new publicly traded shell company. Zemsky understood that PH and AF were planning to use the shell company in a manner similar to AFHJ to defraud AF's brokerage account customers by having their accounts buy the stock of the new shell company at grossly inflated prices on the open market from nominees of PH. Zemsky understood that PH and AF would be fixing the inflated prices at which the sales would take place prior to placement of orders by AF and PH's nominees. Zemsky further understood that unbeknownst to AF's brokerage account customers, AF would receive illegal kickbacks from PH of a portion of the profits from these sales. Zemsky also knew that AF, in defrauding his brokerage account customers in this manner, would be illegally manipulating the market for the shell company's stock, and also violating the duties of honesty, fair dealing and loyalty which AF owed to his customers. Zemsky understood and expected that at a later point in the scheme he would sell free trading shares under his control at artificially inflated and manipulated prices. Knowing all of this, Zemsky decided to assist PH and AF in their scheme to defraud AF's brokerage account customers.

15.    Zemsky contacted RS and requested that RS assist him in obtaining effective ownership and control of a publicly traded shell company. Zemsky further asked RS to assist him in having the shell company issue 4,000,000 free trading shares and to transfer control of those free trading shares to PH's secret nominees, Zemsky's secret nominees, and RS (75,000 shares). Zemsky, and RS knew and understood that such activity would result in PH gaining secret control of a majority of the free trading shares of the shell company. Furthermore, Zemsky

understood that RS would utilize the RS Procedure described generally in paragraph 4 to obtain and deliver effective ownership and control of the publicly traded shell company.

16. RS agreed to provide a shell company, which he would obtain and "clean up" utilizing the RS Procedure, in exchange for compensation of $150,000 and a refundable $25,000 deposit. This shell company would be SSLX. However, RS and Zemsky agreed that RS would not receive $150,000 in cash. Instead, RS was promised 75,000 shares of the shell company's free trading stock with the understanding that RS would sell the stock on the open market according to Zemsky's instructions at the price of $2.00 per share. Zemsky and RS each understood that RS' sale of stock would consist of prearranged trades at $2 per share for which their co-conspirators would have buyers lined up to purchase the shares at that artificially inflated price. RS and Zemsky each also well knew and understood that the shares of this shell corporation, which would have de minimus assets and revenues and virtually no business operations, would not be worth $2 per share. RS and Zemsky further knew and understood that the planned $2 per share transactions would have the effect of artificially setting the price for the shell company's stock at the inflated price of $2 per share. Knowing all of this, RS and Zemsky agreed upon this method of compensating RS for the shell.

17. Even though the nominees Douglas Zemsky proposed using to receive free trading shares of the shell company's common stock were neither Texas residents or Texas domiciles, RS informed Zemsky that he would issue an opinion letter to the shell company's transfer agent instructing the transfer agent to issue 4,000,000 free trading shares without a restrictive legend to the shareholders designated by Zemsky based upon RS's representation in the letter that Rule 504 in combination with provisions of the Texas Administrative Code allowed the shares to be issued

9

without a restrictive legend because the shares would be distributed solely to a limited number of accredited investors who were all residents or domiciled in Texas. RS and Zemsky well knew that none of the nominees who were to receive SSLX free trading shares were residents or domiciles of Texas. Notwithstanding this knowledge, RS and Zemsky executed the plan to have the free trading shares of SSLX issued to nominees of PH and Zemsky, who were not Texas residents or domiciliaries.

18. RS utilized the RS Procedure to deliver control of SSLX to Zemsky. On or about April 12, 2005, Zemsky was named President and sole director of SSLX. On or about April 19, 2005, Zemsky executed an SSLX board of director's resolution ordering the issuance of 40 million restricted shares of SSLX stock in his name which made Zemsky the majority shareholder of SSLX. On or about April 19, 2005, RS sent an opinion letter to the stock transfer agent for SSLX directing the transfer agent to issue 4 million unrestricted (free trading) shares to nominees of PH, Zemsky and himself (75,000 shares). In the letter RS falsely represented that the shares were not required to be registered with the Securities and Exchange Commission, and should therefore be issued without a restrictive legend because all of the shareholders who were going to receive the shares resided in, or were domiciled in Texas. In reality, only RS was a resident of Texas. Based upon RS's opinion letter, the stock transfer agent issued 4,000,000 free trading shares to the nominees of PH, Zemsky, and to himself (75,000 shares).

19. On or about April 22, 2005, RS and Zemsky coordinated the pre-arranged trades on the open market of RS' 75,000 shares for $2 per share. RS followed Zemsky's instructions for placing the order to sell the shares. Zemsky thereafter coordinated with PH and others to make sure that the shares were purchased at the artificially inflated price of $2 per share. RS's shares

10

were the only SSLX shares traded that day (other than shares traded by intermediary brokers), and RS' sales set the market price for SSLX, a company with de minimus assets and revenues and virtually no business operations, at $2 per share. Zemsky knew and understood that AF's customer accounts would purchase the overwhelming majority of RS's SSLX shares. These manipulated trades made it appear that SSLX had a market capitalization of more than $88,000,000. Both Zemsky and RS knew and understood that these pre-arranged trades at the artificial price of $2 per share would open the market for SSLX stock at the artificially inflated price of $2 per share.

20. Pursuant to PH's instructions, Zemsky executed an agreement on May 6, 2005 to sell his 40 million restricted shares to a retired U.S. Army Major General who wanted to use SSLX to create a publicly traded homeland security company. The consideration for this sale of 40 million restricted shares by Zemsky to the retired general was $1, which was never paid, and 100,000 restricted shares of SSLX for Zemsky. This had the effect of furthering the scheme to defraud the customers of AF.

21. After Zemsky arranged for the transfer of free trading SSLX shares to nominees of PH and Zemsky, AF and PH used the SSLX shares to defraud the brokerage firm customers of AF. AF had his customers' accounts purchase shares of SSLX in the open market from nominees of PH. AF and PH closely coordinated the orders for the trades to try to assure that AF's customer account purchases on the open market at grossly inflated prices were matched to sales of SSLX stock by PH's nominee accounts. AF and PH also agreed that PH would pay AF kickbacks of a portion of the profits from the fraudulent sale of SSLX stock to AF's customers at grossly inflated prices. AF, PH and Zemsky each knew that AF, by defrauding his customers to

11

receive kickbacks, was violating the duties of honesty, fair dealing and loyalty that AF owed to his brokerage firm customers. During the time period that AF and PH were using the free trading SSLX shares to defraud AF's brokerage firm customers, Zemsky continued to control a large block of SSLX free trading stock. Zemsky understood that he could sell this stock for a profit at a later date.

22. On July 15, 2005, the Securities and Exchange Commission suspended the trading of SSLX securities for 10 days due to a lack of current and accurate information about the identities of management and directors of SSLX and its status as a corporate organization. Zemsky understands that customers of AF lost at least $3.8 million as a result of the SSLX fraud scheme which Zemsky participated in and aided and abetted.

### The Conspiracy

23. From in or about January of 2004 and continuing thereafter through at least September 27, 2005 in the District of Columbia and elsewhere, the defendant DOUGLAS ZEMSKY did unlawfully and knowingly conspire, combine, confederate, and agree with other persons both known and unknown to the United States to commit the offenses of mail fraud in violation of 18 U.S.C. §§1341 and 1346, wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, and securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, and did aid and abet the conspiracy of PH, and AF to commit mail fraud, wire fraud and securities fraud.

### Purpose of the Conspiracy

24. A purpose of the conspiracy was for defendant DOUGLAS ZEMSKY and co-conspirators, to fraudulently obtain money, funds and property from clients of AF and other investors for the use and benefit of the defendant and co-conspirators, to deprive clients of AF of

12

the intangible right to the honest services of their broker, and to further the conspiracy by various means, including by omissions of material fact and false material pretenses, representations and promises, and by artificially manipulating the price of the securities of AFHJ and SSLX.

## Manner and Means of the Conspiracy

25. It was part of the conspiracy that DOUGLAS ZEMSKY, PH, AF, and other co-conspirators agreed to obtain secret control of a large majority of the outstanding free-trading shares of stock in AFHJ and SSLX, and thereafter fraudulently manipulate the market price of AFHJ and SSLX stock by coordinating prearranged "matched orders" (that is, stock purchases and sales with the knowledge and understanding that a reciprocal order of substantially the same amount would be entered at or around that time for substantially the same price) at inflated prices through the Over the Counter Securities market to create the false and misleading appearance of an active and rising market in AFHJ and SSLX stock and to induce victims to purchase shares at artificially inflated prices that were far in excess of the value of the securities.

26. It was further part of the conspiracy that DOUGLAS ZEMSKY, PH, AF, and other co-conspirators agreed that AF and PH would execute prearranged trades between AF customer accounts and PH nominees and split the profits from such trades between AF and PH without informing AF's clients that AF was receiving cash kickbacks of a significant percentage of the profits from their purchases of AFHJ and SSLX stock.

27. It was further part of the conspiracy that DOUGLAS ZEMSKY, PH, AF and others agreed during telephone conference calls that payment to RS for RS utilizing the RS procedure for AFHJ would be routed from AF to DOUGLAS ZEMSKY and MB, and, thereafter, on to RS. DOUGLAS ZEMSKY and MB received $225,000 from AF, and paid $150,000 of this money to

RS and $25,000 of this money to PH. Prior to this, MB had paid RS a $25,000 deposit to obtain control of a shell corporation.

28. It was further part of the conspiracy that on or about April 22, 2005, through telephone conversations and other messages and coordinated trading activities, DOUGLAS ZEMSKY, PH, AF, RS and others caused pre-arranged trades of SSLX stock to be made at the artificially inflated price of approximately $2 per share, resulting in RS receiving approximately $150,000 in proceeds, which were in large part fraudulently obtained from AF's clients, and resulting in SSLX stock beginning to trade on April 22, 2005 at the artificially inflated and manipulated price of $2 per share. These transactions had the effect of compensating RS for engaging in the fraudulent RS procedure to deliver control of SSLX to Zemsky, and control of free trading SSLX shares to nominees of Zemsky and PH.

29. It was further part of the conspiracy that AF failed to disclose to his clients material information about investing in AFHJ and SSLX, including his personal interest in the AFHJ and SSLX trades.

30. It was further part of the conspiracy that AF executed orders in client accounts to purchase SSLX and AFHJ stock in the market from accounts controlled by PH under the false pretense that the prices paid for SSLX and AFHJ stock were prices determined by a competitive market.

31. It was further part of the conspiracy that DOUGLAS ZEMSKY, PH and AF deprived AF's customers of the intangible right to a broker's honest services.

32. It was further part of the conspiracy that DOUGLAS ZEMSKY, received at least $12,500 in payment for his participation in the fraudulent manipulation of AFHJ stock.

14

33. It was further part of the conspiracy that DOUGLAS ZEMSKY received through a nominee and retained 1,075,000 free trading shares of SSLX stock, 100,000 restricted shares of SSLX stock, and $70,000 as payment for his participation in the fraudulent manipulation of SSLX's stock price and the scheme to defraud AF's brokerage customers.

34. It was further part of the conspiracy that as a result of the fraudulent pre-arranged trades of AFHJ and SSLX stock, the co-conspirators fraudulently obtained proceeds in excess of $4.4 million.

35. It was further part of the conspiracy that in order to conceal the conspiracy and scheme to defraud AF's clients, DOUGLAS ZEMSKY did give certain false and misleading answers during sworn testimony before the Securities and Exchange Commission on September 28, 2005.

### Overt Acts

36. In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the District of Columbia and elsewhere:

a. On May 9, 2005, a telefax message, containing a letter regarding SSLX stock was sent through interstate wire transmission from Washington, D.C., to Hallendale Beach, Florida.

b. On May 10, 2005, a Federal Express envelope containing a stock certificate and stock transfer records was sent from Hallendale Beach, Florida to SSLX offices at 44 North Capitol Street, N.W., Washington, D.C. 20001.

c.  On June 22, 2005, an electronic mail message, regarding corporate filings for SSLX, was sent through interstate wire transmission from the State of California and was received in Washington, D.C.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney
for the District of Columbia

By: _____

JONATHAN BARR
JOHN GRIFFITH
Assistant U.S. Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 353-2453

## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense.  Pursuant to Fed. R. Crim. P. 11 and 28 U.S.C. § 1746, after consulting with my attorneys Jarrett Wolf, Esq. I agree and stipulate to this Statement of Offense, and admit and declare under penalties of perjury that the facts recited within this Statement of Offense are true and correct.

Date: 7/17/07                    _____

Douglas Zemsky, Defendant

I have discussed this Statement of Offense with my client, Mr. Zemsky.  I concur with his decision to stipulate to this Statement of Offense.

Date: 07/17/2007                 _____

Jarrett Wolf, Esq.
Attorney for the Defendant

16